## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**CLAIRE ELIZABETH MCWILLIAMS,**       Case No. 5:19 CV 2363

      Plaintiff,       Judge John R. Adams

      v.       Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.       **REPORT AND RECOMMENDATION**

### INTRODUCTION

Plaintiff Claire McWilliams ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated October 10, 2019). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed.

### PROCEDURAL BACKGROUND

Plaintiff filed for SSI in October 2015, alleging a disability onset date of April 9, 2014. (Tr. 286-91).[1] Her claims were denied initially and upon reconsideration. (Tr. 219-30). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before an administrative law judge ("ALJ") on May 23, 2018. (Tr. 36-58). At the hearing, Plaintiff requested

---

1. Plaintiff's prior claim for disability was denied on April 8, 2014. *See* Tr. 129-47. The Appeals Council denied review on October 6, 2015. (Tr. 155-61).

review of a closed period of disability from May 27, 2014 through September 30, 2016. *See* Tr. 15, 41. On June 26, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-27). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-5); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on October 10, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1983, Plaintiff was 30 years old on her alleged onset date. *See* Tr. 286. At the time of the hearing, Plaintiff (who was 5'9" tall) weighed approximately 270 pounds. (Tr. 43).

Beginning in January 2016 and continuing through the May 2018 hearing, Plaintiff worked 30 hours per week as an administrative assistant. (Tr. 43-44). In that job, she sat for "[o]ver half the day" and lifted fifteen to twenty pounds. (Tr. 44). She missed work one to four days per month and took unscheduled breaks two to three times daily (for fifteen minutes to an hour) due to anxiety or other stressors. (Tr. 50-51). Her employer accommodated these needs. (Tr. 50-52).[2]

Plaintiff testified that during the relevant time period her main problems were pain, migraines, inability to handle stress, difficulty interacting with the public and her supervisor at work, and "trying to deal with all the miscellaneous medical appointments and then medical diagnoses and so forth". (Tr. 47). She had headaches three to five times per week. (Tr. 52). She also had "what is close to COPD asthma, but it is not labeled as COPD". *Id.* She treated this with medication; aggravating factors included strong scents, dust, and heat. (Tr. 53).

---

2. In May 2016, Plaintiff and her employer signed a letter detailing the accommodations her employer provided. (Tr. 1841-44). Her employer also wrote a follow-up letter detailing these accommodations and the circumstances of her employment. (Tr. 361).

Plaintiff estimated she could walk about fifteen minutes at one time, and lift or carry a maximum of twenty pounds. (Tr. 47). Before Plaintiff started working, her typical day consisted of waking up, playing with her cats, possibly eating a little, "and then going back to bed and sleeping". (Tr. 48). Her fiancé did the household chores. *Id.*

Plaintiff saw a counselor for approximately eight years; it was helpful. (Tr. 48). She also took medications, but experienced side effects such as dizziness, dry mouth, muscle cramps, and concentration issues. (Tr. 49). She had difficulty with short-term memory, decision-making, and following instructions ("[u]sually I would have to have them repeated up to four or five times"). *Id.* Plaintiff also had difficulty getting along with others. *Id.*

Relevant Medical Evidence

*Physical Health*

In February 2014, Plaintiff saw neurologist James Bavis, M.D., at NeuroCare Center, for complaints of left leg weakness, migraines, numbness, balance problems, and obstructive sleep apnea. (Tr. 565). On examination, Plaintiff had normal gait, station, coordination, reflexes, muscle strength and tone; she had "mild nystagmus on turns". (Tr. 566-67). Dr. Bavis also noted an October 2013 EEG and June 2013 MRI were normal. (Tr. 567).

In June 2014, Plaintiff told Dr. Bavis that she had worsening leg pain, and frequent severe headaches. (Tr. 546). Plaintiff reported good and bad days with her leg pain, and no falls. *Id.* On examination she had normal gait, station, muscle strength and tone. (Tr. 547). Plaintiff also underwent a physical therapy initial evaluation in June for her head, neck, and upper extremity pain. (Tr. 459-60). She completed physical therapy (sixteen visits) in July 2014. (Tr. 469).

Plaintiff went to the emergency room for a headache she described as moderate to severe in July 2014. (Tr. 462-63). She was given intravenous medication and felt better. (Tr. 463).

Plaintiff returned to Dr. Bavis in September 2014 reporting an increase in migraines (after a previous decrease). (Tr. 536). She underwent a Botox injection. (Tr. 537). In December, Plaintiff reported her headaches were "markedly reduced, but not gone" with the Botox treatment; she was down to one to two migraines per week. (Tr. 529). Plaintiff also reported muscle spasticity in her arms; an EMG of her upper limbs was normal (Tr. 528).

In January 2015, Plaintiff saw Ned Nafziger, M.D., at NeuroCare Center; Dr. Bavis referred Plaintiff for possible occipital nerve blocks to treat occipital neuralgia (which triggered her headaches). (Tr. 520). On examination, Plaintiff had normal muscle strength (except "some giveaway weakness with resistant muscle testing upper extremities"), tone, sensation, and reflexes; she had decreased cervical range of motion with rotation and tenderness over the occipital nerves, but functional and pain free range of motion in all limbs. (Tr. 523). Her gait was "non-antalgic with functional balance." *Id.* Plaintiff reported a prior occipital block helped. (Tr. 520). Dr. Nafziger assessed occipital neuralgia cervical syndrome and scheduled Plaintiff for occipital nerve blocks. (Tr. 523). That same month, Dr. Bavis noted Plaintiff had temporary reduction in her migraines, but they had returned. (Tr. 515). She underwent another Botox injection. (Tr. 517).

Plaintiff returned to Dr. Nafziger at the end of January 2015 (Tr. 509-31) and underwent occipital nerve blocks in January, March, April, May, June, July, and August (Tr. 514, 772-77).

In July 2015, Plaintiff complained of extreme fatigue and feeling "off balance". (Tr. 721). On examination, she had full strength, normal reflexes, and normal sensation, full range of motion, normal motor strength, and normal gait. (Tr. 724). The physician ordered lab work, recommended follow up with Dr. Bavis, and diagnosed fatigue, diabetes, sleep apnea, vitamin D deficiency, palpitations, dysphasia, and anterior neck pain. (Tr. 724-25). Later that month, Plaintiff saw a cardiologist for a "long history of palpitations and several syncopal episodes". (Tr. 726). He opined

4

Plaintiff's syncope was "likely orthostatic with baseline low blood pressure and possible autonomic insufficiency due to diabetes". (Tr. 730). A Holter monitor "demonstrated symptomatic sinus tachycardia and [could not] exclude [postural orthostatic tachycardia syndrome]." (Tr. 734).

In February 2016, Plaintiff told Dr. Bavis that her migraine frequency was "sharply decreased" since she received an increased dose of Botox. (Tr. 1663). She underwent another Botox injection. (Tr. 1665). Less than two weeks later, Plaintiff went to the emergency room with a worsening right-sided headache. (Tr. 2236). She was treated with IV medication. *Id.*

Later that month, Plaintiff slipped on the ice and struck the back of her head when she fell; she went to the emergency room. (Tr. 2238). A CT scan showed no acute abnormality, but an old lacunar infarct; her diagnosis was "[c]losed head injury, concussion." (Tr. 2238); *see also* Tr. 1330.

Plaintiff saw Dennis Davis, D.O., for her concussion in April 2016. (Tr. 1590-95). He diagnosed post-concussion syndrome. (Tr. 1595). Plaintiff followed up with Dr. Bavis, who agreed and noted "the only fix . . . is total rest"; he advised Plaintiff to "rest as much as possible when not working[,] avoid reading, TV, etc." (Tr. 1647). He also assessed a drug-induced headache and advised Plaintiff "to try not to take the pain meds every day". *Id.*

Plaintiff returned to Dr. Bavis in July 2016 complaining of migraine with dizziness, memory impairment, nausea, and vomiting. (Tr. 1964). She also had memory loss, gait disturbances, and headache. *Id.* On examination, Plaintiff had normal gait and station, coordination, and reflexes. (Tr. 1967). Dr. Bavis assessed chronic migraine, concussion, dizziness, and diplopia; he referred Plaintiff to a neuropsychologist and a neuro-optometrist. *Id.*

A July 2016 MRI of Plaintiff's brain – ordered due to amnesia, history of concussion, pain, tenderness, and posterior head burning – was normal. (Tr. 2443). Plaintiff continued to undergo Botox injections, receiving one in August 2016. (Tr. 1961).

5

During the relevant time period, Plaintiff received treatment for her asthma and breathing impairment, which was frequently noted to be well-controlled. *See* Tr. 450-51, 472-73, 483, 919, 1761. Also during the relevant time period, Plaintiff was noted to be obese. *See, e.g.*, Tr. 515, 520, 547, 566, 729.

After the end of the closed period of alleged disability (September 30, 2016), Plaintiff continued to receive treatment for multiple physical health conditions. *See* Tr. 2517-18 (March 2017 – back pain with sciatica), Tr. 2528-64 (March/April 2017 – physical therapy for back pain), Tr. 2569 (June 2017 – new patient visit), Tr. 2720-21 (May 2017 – Dr. Bavis; chronic pain syndrome diagnosis), 2769-70 (August 2017 – sleep apnea study), Tr. 2723-26 (March 2018 – Dr. Bavis; diagnosis of vertebral artery compression syndrome); Tr. 2693-97 (December 2017 – rheumatologist for joint pain); Tr. 2785-89 (January 2018 – follow up with cardiologist).

*Physical Health Opinion Evidence*

In May 2016, Dr. Bavis wrote a letter stating that Plaintiff "is still suffering from the effects of concussion. Please continue her on light duty until I see her in June". (Tr. 1754).

In June 2016, Dr. Bavis wrote another letter stating that Plaintiff "is not to pick up items over 10 pounds and to remain on light duty". (Tr. 1845).

In June 2016, State agency physician Gary Hinzman, M.D., reviewed Plaintiff's records and adopted the physical residual functional capacity ("RFC") finding from a prior ALJ decision. (Tr. 181). That physical RFC concluded Plaintiff could "perform light work", except: "never climb ladders, ropes, or scaffolds", "occasionally climb ramps or stairs", "occasionally stoop, kneel, crouch, and crawl", "have frequent exposure to pulmonary irritants such as fumes, dusts, gases, odors, and poor ventilation", "avoid the use of moving machinery, commercial driving, and unprotected heights." (Tr. 134).

6

In September 2016, State agency physician William Bolz, M.D., reviewed Plaintiff's records and also adopted the physical RFC finding from the prior ALJ decision. (Tr. 206-07).

*Mental Health*

Plaintiff treated at the Counseling Center of Wayne & Holmes Counties. In November 2013, a provider diagnosed major depressive disorder (recurrent, moderate), anxiety disorder, autistic disorder, and personality disorder. (Tr. 585). One year later, in November 2014, Plaintiff reported worsening social anxiety and nightmares resulting in panic attacks. (Tr. 586). During 2014, Plaintiff attended counseling sessions. *See* Tr. 1414-67.

In November 2014, Plaintiff underwent an initial psychiatric assessment; she was diagnosed with bipolar disorder, anxiety disorder, and autism spectrum disorder. (Tr. 648-51). She was prescribed Lexapro. (Tr. 650).

In January 2015, Plaintiff reported fatigue and increased anxiety. (Tr. 1402). In February, her mind was "foggy"; she was irritable and distracted. (Tr. 622). In March, Plaintiff said Prozac initially gave her more energy, then stopped working; she was depressed and suicidal after a friend died. (Tr. 614). She reported nightmares along with panic attacks and OCD episodes. *Id.* In April, Plaintiff discontinued case management services. (Tr. 592). In December, Plaintiff reported a stable mood, but continued anxiety and depression. (Tr. 1386). She stopped her medications except Remeron and Ativan and had "2-3 panic attacks over the last months [sic] that were less intense as in the past." *Id.* She started a part-time job at a friend's company. *Id.* Throughout these 2015 mental health visits, Plaintiff's mental status examination revealed appropriate dress; a calm and cooperative attitude; normal speech and goal-oriented and logical thought processes; an anxious, depressed, or irritable mood; a reactive and mood congruent and blunted or constricted affect;

intact memory; and fair insight and judgment. (Tr. 614-15, 622-12, 1386-87). Her providers adjusted medications. (Tr. 615, 623, 1387, 1403).

Plaintiff returned for counseling in January 2016, reporting increased isolation, increased sleep, anergia, and anhedonia. (Tr. 1338). The following month, Plaintiff reported working part-time, and taking classes at the library and the local art center. (Tr. 1538). She reported fewer depressive symptoms; her anxiety symptoms remained unchanged. *Id.*

At a psychiatric follow-up in March, Plaintiff reported memory and concentration difficulty, nausea, and more headaches post-concussion; her mood was "tired and a little snappy" (Tr. 1382). At counseling that month, Plaintiff "presented with poor/groggy memory" which she attributed to her concussion; she also had a depressed mood and blunted affect. (Tr. 1541). In April, Plaintiff reported an "erratic" mood and memory difficulty. (Tr. 1613). In April 2016, Plaintiff told Dr. Bavis she had short-term memory problems, and "difficulty doing her job of keeping up with the supply records"; "[s]he ha[d] to have her boss write a list of tasks." (Tr. 1644). Dr. Bavis found her concentration and memory were normal. (Tr. 1647).

In May 2016, Plaintiff underwent a consultative psychological evaluation with Robert Dallara, Jr., Ph.D. (Tr. 1833-37). Plaintiff denied difficulties completing work, relating to others, or coping with work demands. (Tr. 1834). Plaintiff did not display any bizarre behaviors and her thinking and speech were logical and clear; she displayed overt signs of anxiety. (Tr. 1835). Plaintiff reported memory difficulty, "stating she forgets conversations and where she places things and at times is confused as to the chronology of events." *Id.* She counted backwards from twenty to one, did well at serial subtraction, recalled three out of three items after a five-minute period, and remembered five digits forward and four in reverse. (Tr. 1835-36). Dr. Dallara assessed dysthymic disorder and panic disorder. (Tr. 1836).

8

At a July 2016 psychiatric follow-up, Plaintiff had, *inter alia*, a calm and cooperative attitude; a reactive and mood congruent and constricted affect; an irritable, anxious and depressed mood; and intact memory and concentration. (Tr. 1943-44). That same month, Dr. Bavis noted normal concentration and abnormal memory. (Tr. 1967).

In July and August 2016, Plaintiff underwent a neuropsychological evaluation with Beth Long, Ph.D. (Tr. 1985-90).[3] Dr. Bavis referred Plaintiff "to determine the cognitive and emotional impact" of her concussion. (Tr. 1985). Plaintiff reported variable sleep, reduced concentration, memory difficulty, anxiety, irritability, low self-esteem, restlessness, tension, panic, and suicidal ideation; however, "[o]verall, symptoms ha[d] improved." *Id.* After testing and evaluation, Dr. Long assessed mild neurocognitive disorder, autism spectrum disorder, major depressive disorder, and anxiety disorder. (Tr. 1987). She recommended Plaintiff undergo vestibular evaluation, continue treatment for her headaches, set a regular daily and sleep schedule, and continue counseling. *Id.*

After the end of the closed period of disability, Plaintiff continued to receive mental health treatment. *See* Tr. 2608 (March 2017 – returned to counseling due to "develop[ing] excessive focus again on her medical symptoms"; "[t]his focus may be interfering in her ability to do her job effectively"), Tr. 2614-89 (March 2017 to April 2018 – counseling and psychiatric records).

*Mental Health Opinion Evidence*

After his May 2016 consultative examination, Dr. Dallara offered a functional assessment. (Tr. 1837). Therein, he opined Plaintiff "would be expected to be able to understand and apply instructions in a work setting consistent with low-average intellectual abilities." *Id.* In response to Plaintiff's "abilities and limitations in maintaining attention and concentration, and in maintaining

---

3. The evaluation occurred over 3 days (July 7, July 22, and August 12, 2016). *See* Tr. 1985.

persistence and pace", Dr. Dallara wrote: "[Plaintiff] did not report a pattern of leaving work due to mental or emotional difficulties. There was no direct evidence during the examination to suggest impairment to her persistence or pace. She was able to track the flow of conversation adequately during the examination and did not show easy distractibility." *Id.* Regarding Plaintiff's "abilities and limitations in responding appropriately to supervision and to coworkers in a work setting", Dr. Dallara wrote: "[Plaintiff] showed marginal eye contact and a somewhat restricted affect. No information was provided to suggest inappropriate comportment during her work history. However due to her depression and anxiety, she may have some difficulties relating to others including fellow workers and supervisors." *Id.* Finally, Dr. Dallara opined that Plaintiff "may have some difficulties withstanding stress and pressure associated with day-to-day work activity." *Id.*

Also in May 2016, State agency psychologist Courtney Zeune, Psy.D., reviewed Plaintiff's records. (Tr. 181-82). Therein, she adopted the mental RFC from a prior ALJ decision. *See* Tr. 182. That RFC limited Plaintiff to: "detailed, but not complex tasks", a "work environment . . . free of fast-paced production requirements, involv[ing] only simple work-related decisions, and routine workplace changes", "occasional[] interact[ion] with the public and coworkers", and "superficial contact, defined as no negotiation or confrontation, with others." (Tr. 134-35).

In August 2016, Dr. Long opined that Plaintiff's autism spectrum disorder "has a disabling impact on her future functioning and ability to engage independently in work that will allow her to be fully financially independent." (Tr. 1988). She summarized:

> [Plaintiff] has strengths in the area of intellectual functioning, but shows impairments in executive functioning and attention. Her performance reveals that she is markedly limited in a variety of areas including the ability to remember detailed instructions and the ability to remember complex procedures. Her variable attention and executive dysfunction will impact her ability to work near others without being distracted, to tolerate change, to be punctual, to complete tasks efficiently, and carry out detailed instructions. Social communication difficulty and rigid thinking will interfere with her ability to relate to supervisors and co-workers,

10

to tolerate changes, to manage frustration, and implement feedback. Instead, she will require that tasks be broken down, considerable supervision, and the provision of checklists in order to complete tasks. Finally, anxiety and depression markedly impact motivation and her ability to tolerate frustration. Due to ease to overwhelm, she experiences increased anxiety attacks. She currently has the benefit of a very supportive environment. Should she change jobs or encounter greater difficulty at her current position, use of vocational services through the Bureau of Vocational Rehabilitation (Opportunities of Ohioans with Disabilities), even for part-time employment or volunteer work, is appropriate. Without the benefit of considerable support and accommodation (as provided for by the Americans with Disabilities Act), she is unlikely to be successful at work.

(Tr. 1988). Dr. Long then provided examples of accommodations. *See id.*

In September 2016, state agency psychologist Katherine Fernandez, Psy.D., reviewed Plaintiff's records. (Tr. 207-09). She opined Plaintiff could understand and remember instructions for "tasks of 2-3 simple steps" and "for some overlearned moderately complex tasks". (Tr. 207). Plaintiff could "work in a setting without requirements for constant fast pace and without quotas" and could "have occasional contact with others", though "[i]nteractions should be superficial, with no need for confrontation or negotiation with others." (Tr. 208). Finally, she opined Plaintiff could "adjust to occasional changes" in the work setting. (Tr. 209).

<u>VE Testimony</u>

A VE testified at the hearing before the ALJ. (Tr. 53-57). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and RFC as ultimately determined by the ALJ. *See* Tr. 55-56. The VE responded that such an individual could perform jobs such as a small parts inspector, laminator, or surveillance monitor. (Tr. 56). The VE further testified that being off task or absent two days per month was work-preclusive. *Id.* The VE also testified Plaintiff's current work situation was accommodated work due to her absenteeism. (Tr. 57).

ALJ Decision

In his June 26, 2018 decision, the ALJ found Plaintiff had not engaged in substantial gainful activity from May 27, 2014 through September 30, 2016 (the requested closed period). (Tr. 18). He found that Plaintiff had severe impairments of: dysfunction of major joints, obesity, asthma, chronic pulmonary insufficiency, organic mental disorder, autism, depression, anxiety and headaches; none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairment. *Id.* The ALJ then concluded Plaintiff had the following RFC during the closed period:

> [She could] perform sedentary work as defined in 20 CFR 416.967(a) except she could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds. She could occasionally stoop, kneel, crouch and crawl. She could never work at unprotected heights, never with moving mechanical parts, and no commercial driving. She could have occasional exposure to humidity and wetness, dust, odors, fumes and pulmonary irritants, and occasional exposure to extreme heat and cold. She is limited to simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work) and simple work related decisions. She is limited to occasional and superficial contact defined as (no tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety and welfare of others) with coworkers and the public.

(Tr. 19-20). The ALJ then found Plaintiff had no past relevant work, and considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 26). Therefore, the ALJ found Plaintiff not disabled from May 27, 2014 through September 30, 2016. (Tr. 27).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence

is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff raises three objections to the ALJ's decision. She contends the ALJ: (1) did not meet his burden at Step Five of the sequential evaluation by failing to consider that Plaintiff's work was accommodated; (2) ALJ erred in his evaluation of the opinion evidence; and (3) failed to properly consider Plaintiff's obesity. For the reasons discussed below, the undersigned finds no error and recommends the Court affirm the Commissioner's decision.

Opinion Evidence

Plaintiff contends the ALJ erred in his consideration of the medical opinion evidence.

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[4] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques;

---

4. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed her claim in 2015 and thus the previous regulations apply.

and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). If an opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight assigned thereto. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* An ALJ is not, however, required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

*Dr. Bavis*

Plaintiff first objects to the ALJ's consideration of Dr. Bavis's opinion. She contends the opinion was "supported by [his] examinations and statement regarding dizziness, memory impairment, nausea, and vomiting associated with both her migraines and post-concussion syndrome." (Doc. 12, at 20) (citing Tr. 1964). In Reply, she contends that the ALJ improperly relied upon the absence of a time-restriction in Dr. Bavis's opinion. (Doc. 16, at 2).

The ALJ explained:

15

> Dr. Bavis wrote a note on behalf of the claimant for her employer indicating she should not pick up items over ten pounds and should remain on light duty following her concussion. As her treating physician, controlling weight is not given to his opinion because he did not provide the length of time the claimant would require these limitations; however, I give some weight to his opinion for the period relative to this decision.

(Tr. 25).

The undersigned finds no error. First, it was reasonable for the ALJ to read Dr. Bavis's opinion as offering temporary restrictions related to Plaintiff's concussion. The entirety of the "to whom it may concern" letter states "[s]he is not to pick up items over 10 lbs and to remain on light duty." (Tr. 1845); *see also* Tr. 1754 (previous letter stating Plaintiff should be "continue[d] . . . on light duty" due to concussion effects). Second, when so read, it was also reasonable for the ALJ to discount it for its vagueness as to how long the restrictions would apply. *See, e.g.*, *Rouse v. Comm'r of Soc. Sec.*, 2017 WL 1102684, at *4 (N.D. Ohio) (vagueness of opinion is valid reason for discounting); *Pugh v. Comm'r of Soc. Sec.*, 2015 WL 419000, at *14 (N.D. Ohio) ("In light of her qualified opinion, the ALJ's decision to discount the opinion based on its vagueness is sufficiently clear and supported by the evidence."); *Hanna v. Colvin*, 2014 WL 3749420, at *15 (N.D. Ohio) (upholding ALJ's rejection of treating physician's opinion on the grounds that it was incomplete and internally inconsistent, and noting that "courts have upheld an ALJ's rejection of a physician opinion on the grounds that it is inconsistent, unclear, or vague"). Third, although Plaintiff cites records she contends support Dr. Bavis's restriction to "light duty", such as dizziness, memory impairment, nausea, and vomiting, Dr. Bavis himself did not make this connection in his one sentence letter. Finally, Plaintiff has not demonstrated Dr. Bavis's opinion conflicts with the RFC. "Light duty" as opined by Dr. Bavis is undefined and does not translate into any particular functional limitations; nor does Dr. Bavis explain further. The RFC provides for a limited range of sedentary work with extensive attendant mental restrictions. (Tr. 19). Sedentary work, by

definition, involves lifting no more than 10 pounds. *See* 20 C.F.R. § 416.967(a). Therefore, even if the ALJ's explanation were deficient, the undersigned would find it to be harmless error. *See Wilson*, 378 F.3d at 546–47 (ALJ's violation of procedural rules is harmless and "will not result in reversible error absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses").

*Dr. Long*

Plaintiff next objects to the ALJ's evaluation of Dr. Long's opinion. The ALJ explained:

> I give Dr. Long's opinion some weight; however, other evidence does not corroborate her opinion. Although she assessed limitations relative to a higher skill set, she did not consider simple, routine tasks, which accommodate many areas that Dr. Long assessed as limitations, evidenced by her notation that the claimant was markedly limited in remembering detailed instructions and complex procedures, as well as carrying out detailed instructions. She opined that the claimant would have difficulty in social communication but she did not consider less intense situations in which the claimant would have less contact with others in order to limit frustrations from social interactions.

(Tr. 25). Moreover, just two paragraphs earlier, the ALJ specifically explained how he accommodated some of Dr. Long's opinions into his RFC:

> Although noting the claimant had strength in intellectual functioning, Dr. Long assessed impairment in executive functioning and attention. She opined that the claimant was markedly limited in remembering detailed instructions and complex procedures, as well as carrying out detailed instructions (Ex C39F, 30), which I considered in limiting the claimant to simple, routine and repetitive tasks. These limitations are also accommodative of her anxiety and depression that Dr. Long opined markedly impacted her motivation and ability to tolerate frustration. Dr. Long further opined that her variable attention and executive dysfunction impacted her ability to work near others without being distracted, tolerating change, punctuality and independently initiating and completing tasks efficiently. In addition, she opined that difficulty in social communication and rigid thinking would interfere with her ability to relate to supervisors and coworkers as well as tolerate change (id.). Therefore, I limited the claimant to occasional and superficial contact with coworkers and the public, noting she would not have to engage in situations with inherent frustrations related to arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety and welfare of others.

17

(Tr. 24-25).

The ALJ's explanation, combined with her prior description of Dr. Long's opinion as compared to the RFC, provides reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the . . . opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *4. The ALJ explained that, although Dr, Long opined Plaintiff had limitations "relative to a higher skill set" (such as a marked limitation in remembering and carrying out detailed instructions), she "did not consider simple, routine tasks" such as the ALJ's RFC described. (Tr. 25). That is, the ALJ explained that one limitation (Dr. Long's opinion that Plaintiff could not perform detailed tasks) was not necessarily preclusive of another (the ALJ's RFC limiting Plaintiff to simple, routine tasks). The same is true for the ALJ's analysis of Plaintiff's social limitations. The ALJ explained that although Dr. Long opined Plaintiff would have difficulty in social communication due, in part to frustration tolerance, this opinion "did not consider less intense situations in which the claimant would have less contact with others in order to limit frustrations from social interaction." *Id.* That is, the ALJ explained that he accommodated these higher-frustration social interaction situations by limiting Plaintiff to "occasional and superficial contact with coworkers and the public" and no "situations with inherent frustrations related to arbitration, negotiation, confrontation, directing the work of others, persuading others or being responsible for the safety and welfare of others" (Tr. 24-25), while pointing out that Dr. Long's opinion did not speak to Plaintiff's ability to work in such a more-restricted environment. (Tr. 24-25); *see also* Tr. 19-20 (RFC).[5] The ALJ partially discounted Dr. Long's opinion because he found

---

5. The undersigned disagrees with Plaintiff's characterization of the Commissioner's brief as providing *post hoc* reasoning for the ALJ's consideration of Dr. Long's opinion. *See* Doc. 16, at 2. The Commissioner's explanation follows the ALJ's reasoning. *Compare* Tr. 25, *with* Doc. 15, at 14-15.

it did not address whether some of Plaintiff's difficulties could be accommodated by restrictions such as those set forth in the ALJ's RFC. As noted above with respect to Dr. Bavis's opinion, this lack of specificity, or vagueness, is a valid reason to discount a treating physician opinion. *See, e.g.*, *Rouse*, 2017 WL 1102684, at *4; *Pugh*, 2015 WL 419000, at *14; *Hanna*, 2014 WL 3749420, at *15. The ALJ restricted Plaintiff's RFC to account for several of Dr. Long's limitations, while finding that Dr. Long did not offer an opinion regarding the more restrictive RFC set forth by the ALJ. The ALJ thus provided the required "good reasons" for partially discounting this opinion.

*State Agency Physicians*

Plaintiff presents a single-sentence argument in her opening brief about the reviewing physician opinions: "In this matter, the ALJ gave considerable weight to the reviewing physicians, but erroneously failed to incorporate their limitations into his RFC." (Doc. 12, at 19). The Commissioner is correct that it is not *per se* error to give great or considerable weight to an opinion without adopting all restrictions opined therein. *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a State agency psychologist's opinions verbatim; nor is the ALJ required to adopt the State agency psychologist's limitations wholesale."). Here, the ALJ did not state he was adopting Dr. Fernandez's opinion *in toto*, but rather stated he gave it "considerable weight". *See* Tr. 26. Thus, Plaintiff's single-sentence argument fails. If Plaintiff intended there to be more to this argument, she did not say so. *See Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) ("Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible

argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).[6]

*Miscellaneous Arguments*

Within this section of her brief, Plaintiff also raises a cursory argument regarding the ALJ's failure to mention two records. She contends: "[T]he ALJ failed to discuss the findings of Dr. Stainbrook, [Plaintiff's] rheumatologist (Tr. 2693) and the finding by the Counseling Center that her excessive focus on her medical symptoms may be interfering with her ability to do her job effectively (Tr. 2608)." (Doc. 12, at 22). She provides no further elaboration. First, there is no requirement that an ALJ discuss every piece of evidence in the record. *See Kornecky*, 167 F. App'x at 508. Second, Plaintiff has failed to explain what harmful error resulted from the ALJ's failure to discuss these records or point to any specific inconsistency between the records and the RFC. As such, the undersigned finds the argument underdeveloped and waived. *See Moore*, 573 F. App'x at 543; *McPherson*, 125 F.3d at 995-96. Moreover, the undersigned notes that both records

---

6. In Reply, Plaintiff offers a newly-expanded argument: "According to Dr. Fernandez, Plaintiff could only have occasional superficial contact with others (Tr. 208). The ALJ committed harmful error when he modified this limitation to include only coworkers and the public (Tr. 19-20). This is a substantial and harmful deviation from the opinion of Dr. Fernandez." (Doc. 16, at 3). But this is a separate argument from that raised in the opening brief and is thus waived. *See McPherson v. Woods*, 506 F. App'x 379, 387 (6th Cir. 2012) (holding that an issue referenced perfunctorily in an opening brief and "exclusively developed" in a reply brief is still subject to waiver); *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (explaining that "reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration") (emphasis in original) (citation and quotation omitted); *see also Colvin v. Comm'r of Soc. Sec.*, 2019 WL 4743624, at *4 (N.D. Ohio) ("[T]he Magistrate Judge correctly determined that Plaintiff's arguments surrounding treating physicians is waived, because any such arguments were not raised in his opening brief. Indeed, Plaintiff does not identify the treating physician opinion to which he refers, identify what was problematic about that opinion, or apply regulations and case law concerning treating physicians to the record."). Plaintiff only argued that it was error for the ALJ to assign considerable weight without adopting all restrictions. She failed to identify any restriction she alleged should have been included. Her argument attempting to do so in Reply comes too late.

to which Plaintiff points *post-date* the closed period of disability for which Plaintiff argued (ending September 30, 2016) and she has presented no evidence or argument that those records relate to an earlier time period. *See* Tr. 2693 (December 2017 rheumatologist visit), 2608 (March 2017 counseling visit); *see also Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 537 (6th Cir. 2002) (rejecting the alleged relevance of certain records, in pertinent part, because the records consisted of evidence pertaining to the claimant's condition *after* the closed period).

Obesity

Plaintiff also contends the ALJ erred in his evaluation of her obesity.

Obesity is defined as "a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281, at *2.[7] It must be considered at each step of the ALJ's analysis. *Id.* at *1; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016). This is because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 34686281, at *1. Specifically, the ALJ must consider "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment" and an individual's ability to sustain a function over time when formulating the RFC. *Id.* at *6.

However, the "ALJ is not required to use any 'particular mode of analysis' in assessing the effect of obesity." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)); *see also Bledsoe*, 165 F. App'x at 412 (SSR 02-1p "only states that obesity, in combination with other impairments, 'may' increase the severity of the other limitations. It is a mischaracterization to suggest that Social Security

---

7. SSR 19-2p rescinds and supersedes SSR 02-1p, but has an effective date of May 20, 2019, which post-dates the ALJ's decision in this case by almost 11 months. *See* SSR 19-2p, 2019 WL 2374244.

Ruling 02–01p offers any particular procedural mode of analysis for obese disability claimants."). If all of the evidence the ALJ relies on considers the claimant's obesity, then the ALJ will have satisfied the regulations. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 667 (6th Cir. 2004) ("The absence of further elaboration on the issue of obesity likely stems from the fact that Essary failed to present evidence of any functional limitations resulting specifically from her obesity."); *Spence v. Comm'r of Soc. Sec.*, 2020 WL 1818041, at *4 (E.D. Mich.) ("But [the plaintiff] fails to cite to any evidence in the record connecting his obesity to specific functional limitations, citing only to the advice of [a] nurse practitioner . . . that he lose weight to reduce his back pain, which the ALJ acknowledged in his RFC determination; nor does he specify in his motion or memorandum in support how his obesity creates limitations that would justify a more restrictive RFC. . . . Accordingly, Plaintiff failed to sustain his burden of showing how his obesity limited his ability to a degree inconsistent with the ALJ's RFC determination.") (internal record citation omitted), *report and recommendation adopted*, 2020 WL 1329437.

The ALJ here expressly acknowledged Plaintiff's obesity, finding it to be a severe impairment. *See* Tr. 18. Further, he cited obesity in his RFC analysis – in combination with Plaintiff's other impairments – as part of his rationale for limiting Plaintiff to a sedentary exertional level. *See* Tr. 22 ("In arriving at a sedentary level of exertion, I considered the claimant's migraine headaches, obesity, ongoing ankle pain as well as asthma."); Tr. 26 ("I find a range of sedentary exertion is commensurate with her persistent complaints of ankle pain while undergoing physical therapy combined with her obesity, migraines and asthma."). Plaintiff contends the ALJ "failed to assess [Plaintiff's obesity] in light of the relationship between the obesity and her diabetes, diabetic neuropathy, migraines, and asthma" (Doc. 12, at 24), but does not identify any additional functional limitations – unaccounted for by the ALJ's RFC – that this combination of her obesity

and other impairments does not adequately accommodate. Nor does she do so in Reply. *See* Doc. 16, at 1. Indeed, the RFC contained significant physical limitations. *See* Tr. 19 (limiting Plaintiff to sedentary work with: occasional stooping, kneeling, crouching, crawling and climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds, no unprotected heights or moving mechanical parts; and occasional exposure to pulmonary irritants and extreme temperatures). Thus, the undersigned agrees with the Commissioner that "Plaintiff's speculation that the ALJ was obligated to conclude that the combined impact of her obesity caused additional but unspecified functional limitations beyond those already accounted for in the RFC does not provide a basis for reversal." (Doc. 15, at 7); *see also Essary*, 114 F. App'x at 667.[8]

Step Five

Finally, Plaintiff contends the ALJ erred at Step Five of his analysis because he failed to properly consider that her work was the result of accommodations from her employer, citing 20 C.F.R. § 416.973. The Commissioner contends the ALJ did not err at Step Five and that Plaintiff's citation to 20 C.F.R. § 416.973 is irrelevant as the ALJ did not find Plaintiff could perform her past work. The undersigned finds Plaintiff has not shown error.

To meet the burden at Step Five, the Commissioner must make a finding "supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation and citation omitted). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on

8. At the end of her obesity argument, Plaintiff – somewhat confusingly – includes a brief paragraph regarding Social Security Ruling 19-4p and Listing 11.02. *See* Doc. 12, at 25. However, as Plaintiff acknowledges, the ruling was not effective until August 26, 2019, long after the ALJ's decision in this case. As such, the undersigned need not address it. *See* SSR 19-5p, 2019 WL 469635.

a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). However, an ALJ is only required to include in the RFC those restrictions he finds credible and supported. *Irvin v. Social Sec. Admin.*, 573 F. App'x 498, 502 (6th Cir. 2014) (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

The regulation Plaintiff cites provides that the Commissioner will consider, when deciding whether work performed meets the "substantial gainful activity" standard:

> (c) If your work is done under special conditions. The work you are doing may be done under special conditions that take into account your impairment, such as work done in a sheltered workshop or as a patient in a hospital. If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity. Also, if you are forced to stop or reduce your work because of the removal of special conditions that were related to your impairment and essential to your work, we may find that your work does not show that you are able to do substantial gainful activity. However, work done under special conditions may show that you have the necessary skills and ability to work at the substantial gainful activity level.

20 C.F.R. § 416.973(c). The regulation then provides examples of special conditions. *See id.*

The undersigned agrees with the Commissioner that the regulation is not relevant. Here, the ALJ found Plaintiff had *not* engaged in substantial gainful activity during the requested closed period. (Tr. 18). Further, the ALJ did *not* find Plaintiff could perform any past relevant work that may have been accommodated. *See* Tr. 26 ("The claimant has no past relevant work."). Although Plaintiff is certainly correct that she presented evidence that her part-time employment was accommodated by her employer (*see* Tr. 361, 1841-44), the ALJ did not find that Plaintiff could perform this particular work, but rather crafted an RFC based on the record as a whole.

The case cited by Plaintiff in Reply, *Lauriano v. Commissioner of Social Security*, 2015 WL 731429 (N.D. Ohio) is distinguishable. There, an ALJ found accommodations provided to a claimant as a student were not relevant "on the basis that they were rendered in an academic, rather

than vocational setting." *Id.* at *7. The court explained that "the accommodations required . . . would appear analogous to a situation of work which is 'done under special conditions' that take into account an impairment." *Id.* at *10. It further found it could not "determine the extent to which" the ALJ may have considered them because the ALJ did not explain. *Id.* at *11.

To the extent Plaintiff argues the ALJ erred in not including her presently-provided workplace accommodations in the RFC, the undersigned disagrees. In contrast to *Lauriano*, the ALJ expressly considered the accommodations provided by Plaintiff's employer, explaining that he did not find them persuasive because: (1) "[the employer] acknowledges that the claimant became an employee as a favor to a friend" and "cannot be considered a disinterested third party witness whose reports of restriction in functioning would not tend to be discolored by his relationship and a natural tendency to agree with the symptoms and limitations the claimant alleges"; and (2) "he is not medically trained to make exacting observations as to degrees of medical signs and symptoms, or of the frequency or intensity of unusual moods or mannerisms." (Tr. 25). The undersigned therefore finds Plaintiff has not shown the ALJ erred in failing to include the accommodations provided by her employer in the RFC. The ALJ incorporated those limitations he found credible in the RFC (including significant mental limitations to account). (Tr. 19); *see Irvin*, 573 F. App'x at 502. That RFC is supported by substantial evidence. The question to the VE mirrored that RFC and therefore, there is no Step Five error. *Varley*, 820 F.2d at 779.

Although Plaintiff can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports her position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does so here.

**CONCLUSION AND RECOMMENDATION**

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and recommends the decision be affirmed.

 s/ James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).